326 So.2d 57 (1975)
Mary J. RODGERS and Glenn F. Rodgers, Her Husband, Appellants,
v.
W.T. GRANT COMPANY, a Corporation, Appellee.
No. W-243.
District Court of Appeal of Florida, First District.
June 30, 1975.
Rehearing Denied February 3, 1976.
*58 Luke G. Galant, for Dawson, Galant, Maddox, Sulik & Nichols, for appellants.
Marion R. Shepard, of Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, for appellee.
JOHNSON, Judge.
Appellants seek reversal of a final summary judgment in favor of appellee in a suit brought by appellants for malicious prosecution. The action arose as a result of appellee causing the issuance of a warrant against appellant, Mary J. Rodgers, charging her with having issued a worthless check to appellee in the amount of $5.14. There was a preliminary hearing before a Justice of the Peace and, after discussions which will be set forth below, appellant was bound over to the Criminal Court for prosecution. The case was "nol prossed" in the Criminal Court, and appellants instituted the present proceeding for malicious prosecution. The trial court granted appellee's motion for summary judgment upon the ground that the matter of the existence of probable cause was adjudicated and determined by the action of the Justice of the Peace in binding the case over for prosecution. There being no showing of the existence of the necessary elements to support an action for malicious prosecution, the trial court entered summary final judgment for appellee. For the reasons hereinafter delineated, we agree and affirm.
A more specific reception of the facts leading up to the present case is as follows.
Mary J. Rodgers, whom will hereinafter be referred to as "appellant," bought merchandise from W.T. Grant Company in Jacksonville in September of 1971, for which she gave Grant a check in the amount of $5.14, drawn on Lake Forest Atlantic Bank, Jacksonville. Before appellee accepted the appellant's check, she was required to show her driver's license and to write on the check her telephone number, viz: 388-0608. Some seven or eight days later she closed out the account on which the check was drawn, and the balance was deposited in a different account, a checking account. The appellant then went to Grant's on September 13, 1971, and advised the manager of the store, who it was later ascertained was Mrs. Bridges, that she had given the check which had not cleared and that it may be returned because she had closed the account. Mrs. Bridges, in her capacity as manager in as large a store as Grant's in Jacksonville, routinely advised Mrs. Rodgers that if her *59 phone number was on the check and the check was returned, she would get in touch with Mrs. Rodgers. The appellant, at that time, did not realize that she had given the wrong telephone number on the check, and therefore did not advise Mrs. Bridges that the phone number on the check was wrong.
The testimony taken before the Justice of the Peace in October of 1971, reveals the fact that when the check in question was returned to Grant's bearing the notation of "account closed", the credit manager or credit employee of Grant's attempted to call Mrs. Rodgers about the check, but was advised that the telephone number on the check was not that of Mrs. Rodgers. It was also brought out that the correct telephone number of Mrs. Rodgers was 388-0806, but the employees of Grant's had no way of knowing the number was mistakenly, but erroneously given as 388-0608. Although this error involved only the reversal of two digits of the telephone number, it cannot be treated as of small materiality when as a fact the error changed the telephone number enough that it would have amounted to several hundreds of numbers before the correct number of Mrs. Rodgers could have been ascertained. In fact, it could have reasonably been inferred by the credit manager that the erroneous phone number was given intentionally.
But be that as it may, when the bad check was processed through the Justice of Peace after service was made by the Constable, and the concerned parties were before the Justice of the Peace and the true facts had been aired, the Justice of the Peace was ready to dismiss the charge upon payment of only the amount of the check which was already paid and with the understanding that "that would end" the matter. Counsel for the appellant demurred about giving a release from future  (We think the court intended to add "trouble").
The colloquy between the Justice of the Peace and counsel for the appellants can better depict the picture if quoted, to wit:
"THE COURT: In the interest of not letting something like this go to Criminal Court, and it will cost everybody,  if she is willing to pay this check this court at this time will withdraw the charges on the check, if you want to do it that way.
"MR. GALANT: Well, she is willing to pay it, Your Honor. She has already paid it if they will take her money, and then I would like to have the charges dismissed.
"THE COURT: If the charges are dismissed, at that time are you willing to give her clearance to give this lady a release from any future 
"MR. GALANT: I don't think we are prepared to do that at this time, Your Honor.
"THE COURT: If we can't clear this up today,  I mean, the court's interest in this thing was clearing the whole thing up today. If we can't clear it up today, I am going to bind it over to Criminal Court.
"MR. GALANT: Well, Your Honor, this matter of a release is utterly immaterial to these proceedings and has nothing to do with it. I submit there's absolutely no intention  there is obviously no intention on the part of this lady to have
"THE COURT: The only way, Mr. Galant, that we can take care of this now is with the complainant withdrawing the charge because the thing would have been taken care 
"MR. GALANT: She has already 
"THE COURT: The court doesn't want to put either side in jeopardy, for that matter, so we will bind this over to Criminal Court on a proper bond.
"MR. GALANT: All right, Your Honor.

*60 "THE COURT: There is a five dollar check. We will make it a five dollar bond.
"MR. GALANT: All right, sir.
"THE COURT: I imagine you will want to put up a cash bond.
"MR. GALANT: Yes, five dollars cash bond.
"THE COURT: All right, it will be a six dollars cash bond.
"MR. GALANT: All right, sir."
It is clear to us that the first error was committed by Mrs. Rodgers when she gave the wrong telephone number. The next error was when counsel for appellants was not ready to drop the matter. It is equally clear to us that Grant's employees were not motivated by any malice nor any desire to punish appellants. The routine proceeding on a bad check charge was reasonably instituted when the telephone number given by the appellant was wrong and was enough to warrant this procedure. The Justice of the Peace and Grant's were ready to stop. The Justice of the Peace tried to amicably settle a matter in his court, although the origin of the trouble began with the error of the appellants.
We conclude that the trial court was correct in granting the defendant's (appellee's) motion for summary judgment. The Supreme Court of Florida has held that the presence of probable cause was adjudicated when the Justice of the Peace held the appellant should answer the charges and probable cause was presumed from the official action.[1] The Justice of the Peace could not try the case. He could and did try to get the charges dismissed, to which the appellee agreed, but since it could not be dismissed and not "put either side in jeopardy, for that matter", we think all essence of any cause of action for malicious prosecution faded into nothing.
The final summary judgment in favor of appellee is, accordingly, affirmed.
McCORD, J., concurs.
RAWLS, C.J., dissents.
RAWLS, Chief Judge (dissenting).
I dissent. It is elementary that in entering a summary judgment the trial court must conserve the facts in a light most favorable to the party moved against. I therefore recite the facts as I glean same from this record.
The facts are not disputed. On September 2, 1971, Mary J. Rodgers, in payment for a purchase, gave a personal check drawn on a special bank account to W.T. Grant Company. She had ample money in the bank at that time to cover the check. On September 8, 1971, Mary closed the special checking account and opened a regular checking account at the same bank. On September 13, 1971, she received a statement from her bank, together with her cancelled checks, but the check to W.T. Grant Company for $5.14 had not cleared. On that same date (September 13) Mary "went down to Grant's" and advised its office manager, Dorothy Bridges, of the situation. Mrs. Bridges told Mary not to worry, and in the event the check was returned to the store, she would be notified.[1]
At this stage, I pause to note that the majority places great emphasis on the fact that the telephone number given by Mary had two digits reversed and then squarely places full liability upon Mary for the ensuing gross conduct of Grant. It is significant *61 that prior to instituting criminal proceedings that Grant neither called information to ascertain if Mary had a telephone nor attempted to contact Mary by mail or otherwise at her admittedly correct address which she had furnished to Grant.
Approximately one month later, on October 14, 1971, Grant's agent "swore out a warrant" charging Mary with having issued a worthless check. Shortly thereafter, a constable knocked on Mary's door, served a warrant, and advised her if she would take $22 to the Justice of the Peace that it would settle the matter. When Mary told her husband (appellant Glenn F. Rodgers) about her conversation with the constable, he said: "... that there wasn't no way that I was going to take that amount of money for that check, that it wasn't right, and that there was no way that I had knowingly and willingly wrote a worthless check." Mary then again went to Grant's and talked to Mrs. Bridges, who stated that she remembered and when the check came back it seemed like the phone number was not right. Mary then told Mrs. Bridges about the paper, whereupon Mrs. Bridges said, "I am going to call out there and tell them that I am going to accept the money." Mrs. Bridges called "the JP's office" and after hanging up she advised Mary that "... They have informed me I cannot accept the money." Mary then left $5.14 laying on the counter, together with $2.00 to cover the returned check. On the next day another "paper" was served upon Mary.
The next episode is a hearing before the Justice of the Peace. Present at the hearing was Grant's agent (the man that swore out the warrant), Mrs. Bridges, and Mary, who was accompanied by her bank's bookkeeper and her privately retained attorney. At the conclusion of the hearing, the Justice of the Peace advised that the charges would be dismissed if Mary would agree not to bring any further charges against W.T. Grant. Mary's attorney advised the court that he was not prepared to give a release, whereupon the court stated:
"... I am going to bind it over to Criminal Court .. . the only way, Mr. Galant, [Mary's attorney] that we can take care of this now is with the complainant [W.T. Grant Company] withdrawing the charge ... The Court doesn't want to put either side in jeopardy, for that matter, so we will bind this over to Criminal Court on a proper bond."
Although listening to the foregoing observations, W.T. Grant Company's agents stood mute. Subsequently, the state's attorney nolle prossed the charges against Mary.
Appellee agrees that appellants have correctly pointed out that a binding over by the Justice of the Peace does not always create a conclusive finding of probable cause. The elements for a malicious prosecution suit are succinctly stated in Liabos v. Harman,[2] viz:
1) The commencement or continuance of an original civil or criminal judicial proceeding;
2) Its legal causation by the present defendant against the plaintiff;
3) Its bona fide termination in favor of the plaintiff;
4) The absence of probable cause for such prosecution;
5) The presence of malice; and
6) Damages conforming to legal standards resulting to plaintiff.
As to the first and second elements, it is uncontroverted that one George L. Touchton, Jr., a general agent in Grant's credit department, commenced the criminal proceeding by executing an affidavit on behalf of Grant. In addition, Touchton and *62 Grant's office manager, Mrs. Bridges, participated in pressing the criminal charge, resulting in the Justice of the Peace binding Mary over to the criminal court. The bona fide termination in favor of Mary satisfied the third element. It is only the fourth element that is questionable,[3] because if there is an absence of probable cause, legal malice may be inferred.[4]
The trial court in entering the summary judgment found:
"The plaintiffs, on the other hand, argue that the Justice of the Peace acted improperly in binding the case over. This is a matter of judgment behind which this Court is not permitted to go as there is in the file no allegation of proof of fraud, perjury, or other improper or corrupt means utilized in securing the binding over by the Justice of the Peace." [Emphasis supplied]
The trial court then cites as its authority this Court's opinion in Thompson v. Taylor,[5] and the Supreme Court's opinion in Gallucci v. Milavic.[6] Likewise, appellee relies upon the foregoing cases. We note that in Thompson, supra, the Justice of the Peace determined that probable cause existed even after the store manager expressed doubts as to his identification of the accused. This Court, in its opinion, observed: "There is no showing here that O'Neal [store manager] resorted to fraud, perjury, or other improper means." [Emphasis supplied.] Likewise, in Gallucci, supra, the Supreme Court in reviewing the question of probable cause observed that justification for instituting criminal procedure existed if the complainant entertained a reasonable ground of suspicion supported by circumstances strong in themselves to warn a cautious man that the accused was guilty. The uncontradicted facts in the instant case reflect "improper means" by Grant and circumstances that should warn any cautious man of the absence of probable cause.
Great Atlantic & Pacific Tea Company v. Federal Detective Inc.,[7] which also involved a bad check is in point. On behalf of A & P, one Sharp, of The Federal Detective Inc. swore out an affidavit charging Dewey Varner with passing a worthless check. Varner, after being released on bond, went to the A & P Store and requested that the charges be dropped. However, at no time did any official of A & P notify Sharp to drop the charges or attempt in any way to secure dismissal. The appellate court reasoned that the jury was at liberty to conclude that A & P took no steps to cause the charges to be dismissed, notwithstanding prior instructions not to institute legal proceedings, but rather permitted same to continue in hopes of receiving reimbursement for the "bogus" check.
The majority opines: "The next error was when counsel for appellants was not ready to drop the matter." It is inconceivable to this writer that a citizen who has been hauled before a committing magistrate to face criminal charges instituted by a corporate giant, which through its agents activates the criminal process of our judicial system to collect a civil debt, has any duty to compromise such citizen's rights and forego her constitutionally guaranteed "redress for injury".[8] The facts in this *63 case might well be construed by a jury as to be such a callous disregard on the part of Grant's agents in commencing and continuing the criminal prosecution even after the committing magistrate announced "... the only way ... that we can take care of this now is with the complainant withdrawing the charges... ."[9] Unlike the trial court, I find in this record facts that rebut the presumption of probable cause and create questions for the jury to decide.[10]
I would reverse and remand.

ON PETITION FOR REHEARING
SMITH, Judge.
This case is before us on appellants' petition for rehearing of the merits of an appeal which was tentatively concluded by a decision, Chief Judge Rawls dissenting, affirming the trial court. The petition for rehearing appeared to have merit and, at our request, counsel for the parties assisted us with reargument.
The trial court entered a summary final judgment in favor of appellee W.T. Grant Company in the Rodgers' action alleging that Grant maliciously prosecuted Ms. Rodgers for the offense of knowingly issuing to Grant a worthless check in the amount of $5.14. See Sec. 832.05(2), F.S. 1973. The issue is whether, as the trial judge held, the action of Justice of the Peace Motes in binding Ms. Rodgers over to answer criminal charges was an effective determination, conclusive in this proceeding, that Grant had probable cause to institute the prosecution.
The trial judge determined that the committal order of the Justice of the Peace was given conclusive effect on the issue of want of probable cause by the Supreme Court's decision in Gallucci v. Milavic, 100 So.2d 375 (Fla. 1958) and by this Court's decision applying the rule of Gallucci in Thompson v. Taylor, 183 So.2d 16 at 19 (Fla.App.1st, 1966). The trial court therefore did not reach the question of whether, if the committal order were not to be given conclusive effect, the undisputed facts gave Grant probable cause to commence the prosecution. See Lewton v. Hower, 35 Fla. 58, 16 So. 616 (1895); Glass v. Parrish, 51 So.2d 717 (Fla. 1951); but see Oosterhoudt v. Montgomery Ward & Co., Inc., 316 So.2d 582 (Fla.App.1st, 1975).
Some few days after Ms. Rodgers gave a $5.14 check to Grant in payment for merchandise, she and her husband closed the bank account on which the check was drawn and deposited the substantial balance in a new account at the same bank. When Ms. Rodgers discovered that the Grant check was not among the final group of cancelled checks clearing the old account, she went to Grant's and advised the store manager that the check might be returned because the account had been closed. The manager advised Ms. Rodgers that, if her telephone number was on the check, the manager would notify Ms. Rodgers if and when the check was returned so that it could be made good. Neither the store manager nor Ms. Rodgers then realized that Ms. Rodgers had transposed two digits of her new telephone number when writing it on the check. When the check was returned, another employee of Grant's tried unsuccessfully to telephone Ms. Rodgers at the erroneous number and, without attempting to reach Ms. Rodgers at the home address correctly written on the check, he complained under oath to Justice of the Peace Motes that Ms. Rodgers had knowingly issued a worthless check.
Process was served on Ms. Rodgers by a constable who advised her, according to her testimony, that she could dispose of the *64 matter by paying the amount of the check and court costs, aggregating approximately $22. Mr. Rodgers declared to his wife "that there wasn't no way that I was going to take that amount of money for that check, that it wasn't right, that there was no way that I had knowingly and willingly wrote a worthless check." So Ms. Rodgers returned to Grant's, talked again with the store manager and offered to pay the amount of the check and any bank charges resulting from its return. The store manager, after calling the office of the Justice of the Peace, advised Ms. Rodgers that "they have informed me I cannot accept the money," whereupon Ms. Rodgers left cash in the amount of the check, plus $2 to cover costs, on the counter.
At the preliminary hearing before the Justice of the Peace, these facts were made known by Ms. Rodgers and her attorney and by the two representatives of appellee Grant. Without any apparent instigation by Grant employees, Justice of the Peace Motes announced at the conclusion of the hearing that the bad check charges would be dismissed if Ms. Rodgers would give appellee Grant a release. When Ms. Rodgers' attorney declined, the Justice of the Peace replied:
"If we can't clear this up today,  I mean, the court's interest in this thing was clearing the whole thing up today. If we can't clear it up today, I am going to bind it over to Criminal Court... The court doesn't want to put either side in jeopardy, for that matter, so we will bind this over to Criminal Court on a proper bond."
The State Attorney dismissed the charges without further proceedings.
In Gallucci v. Milavic, 100 So.2d at 377-78, the Supreme Court held:
"[T]he presence of probable cause was adjudicated when the justice of the peace held that the appellant should answer the charges. This ruling was not an absolute rule but it raised a presumption of the existence of probable cause which could have been overcome by proof that the appellee had resorted to fraud or other improper means in securing the committal, and as a basis for the evidence it would have been necessary to allege that such was the case. In the complaint filed by the appellant he made no specific charge that the appellee had resorted to improper or corrupt methods in inaugurating the prosecution. He simply alleged that the appellee signed the original affidavits without probable cause, and that as a result of what the appellee did, without probable cause, the appellant was damaged."
Our Supreme Court thus became committed to the proposition that, absent fraud or other "improper means" employed by the complainant in securing a committal order, such an order concludes the issue of want of probable cause and forecloses an action for malicious prosecution against the complainant. We followed the Gallucci decision in Thompson v. Taylor, 183 So.2d at 19, where there was "no showing" by allegations and proof that the complainant "resorted to fraud, perjury or other improper means" in the proceeding before the magistrate who bound the accused over to the criminal court. Applying the Gallucci rule, we held:
"Had there been proof that O'Neal [the complainant] actually knew that Taylor [the accused and later the plaintiff] had not committed the crime but remained silent as to this fact before the Justice of the Peace, and instead positively identified Taylor as the guilty person so that Taylor was prosecuted, then the situation might have warranted a finding of the element of absence of probable cause [notwithstanding the committal order]."
The inadequacy of the Gallucci rule, which accords virtually conclusive effect to a magistrate's ruling, is plainly illustrated by this record. Under the law as given *65 to us, Judge Motes' order obliterates appellants' cause of action irrespective of whether appellee Grant had probable cause to initiate the proceedings. Judge Motes' order was not obtained by perjury, fraud or, for aught that appears, any other improper conduct on Grant's part. To be sure, Grant's employees did not protest when Judge Motes announced his intention to commit Ms. Rodgers to the criminal court; but their deference was a natural, perhaps a proper, attitude for lay people to display in these circumstances. Surely their silence was not misconduct equivalent to fraud. We cannot assume, in the absence of allegations[1] and proof, that Judge Motes' order was the usual and predictable result of concerted action by which department stores use the criminal process to collect civil debts and justices of the peace protect the merchants from the adverse consequences of groundless prosecutions.
Ordering Ms. Rodgers bound over to criminal court, for her refusal to release Grant of what she considered a meritorious claim for malicious prosecution, was the kind of conduct that generates well-deserved contempt for the judicial process. And yet, under the Gallucci rule, we must perpetuate its effect because the misconduct was the court's, not Grant's. Gallucci is contrary to the principle generally observed in the courts of this country, that the order of a committing magistrate binding over or holding an accused for further proceedings is merely evidence of probable cause which is to be considered with other evidence on that issue. Annot., 68 A.L.R.2d 1168, 1173 (1959); III Restatement of Torts § 663(2) (1938)[2]; Prosser, The Law of Torts (3rd ed. 1964) p. 865; 1 Harper and James, The Law of Torts § 4.5 (1956) at pp. 317-18. There is a useful analysis of the issue and the cases in Mr. Justice Lusk's opinion for the Oregon Supreme Court in Hryciuk v. Robinson, 213 Or. 542, 326 P.2d 424 (1958), in which that Court reexamined and receded from its own prior Gallucci rule.
Gallucci derived its rule from Lewton v. Hower, supra, 16 So. at 618, which held only that the trial court did not err in refusing to charge the jury, as requested by the defendant in a malicious prosecution case, that the magistrate's commitment order "contradicts the charge of malice in the prosecution." The Court held that the committal order was not an adjudication of the prosecutor's motive "but only a determination that there was probable cause to hold the prosecuted." Lewton did not hold that the magistrate's committal order forecloses the issue of want of probable cause. Such a holding would have required reversal of the plaintiff's judgment in that case.
In formulating the Gallucci rule the Supreme Court also invoked its decision in Goldstein v. Sabella, 88 So.2d 910 (Fla. 1956), which held only that a judgment of conviction concludes the issue of want of probable cause in a subsequent malicious prosecution action, notwithstanding reversal of the conviction. Unless the judgment was "reversed for fraud, perjury, or other corrupt means," it was held, reversal does not destroy the conviction's effect in determining that there was probable cause *66 to prosecute. The Goldstein decision was entirely in keeping with the view of other authorities.[3]
Malicious prosecution actions have historically been disfavored for their chilling effect on the prosecution of meritorious criminal and civil proceedings and because they continue, often with ill temper, finished litigation which ought to remain undisturbed. See generally Prosser, op. cit. at § 113, p. 859. But the tort has recently gained more favorable, even fashionable, status. Proof of its elements without more now opens the glittering way to punitive damages. Adams v. Whitfield, 290 So.2d 49 (Fla. 1974). Revision of the Gallucci rule would remove another impediment to the successful prosecution of these actions, especially if juries are to be given a greatter license than before to determine what constitutes probable cause. See Oosterhoudt v. Montgomery Ward & Co., Inc., 316 So.2d at 584. Clearly, then, sensitive decisions are now required of the judiciary in the formulation of remedies for malicious prosecution.
Although the Gallucci case did not involve asserted judicial misconduct, we nevertheless believe that our duty is to adhere to and apply the rule of that decision until it is modified by the Supreme Court. We cannot carve a judicial misconduct exception to the Gallucci rule without dealing with the question of who, judge or jury, is to decide whether there was judicial misconduct vitiating the effect of a committal order regular on its face. That is a grave question indeed, for it requires either a denial of a jury trial on a critical issue of fact or a direct assessment by the jury of the legitimacy of judicial action. The more attractive alternative  holding that the magistrate's committal order is simply to be considered with all other evidence on the issue of probable cause  is not available to us under the Gallucci rule. Recognizing, however, that our decision gives conclusive effect to a committal order which evidently was an instrumentality of injustice, we certify to the Supreme Court that the question here passed on is of great public interest: Does the committal order of a magistrate import probable cause to prosecute and thus bar a subsequent malicious prosecution action, notwithstanding that the motive for its entry was to bar that action? Art. V, Sec. 3(b)(3), Florida Constitution; Hoffman v. Jones, 280 So.2d 431 at 434 (Fla. 1973).
Affirmed.
McCORD, J., concurs.
RAWLS, Acting C.J., dissents.
RAWLS, Acting Chief Judge (dissenting).
I adhere to my original dissent which was filed in this cause on June 30, 1975.
NOTES
[1] Gallucci v. Milavic, 100 So.2d 375 (Fla. 1958).
[1] Appellants had obtained a new telephone number because of moving to a new address. One digit of the phone number by the mistake of Mary was reversed. The cashier who accepted the check at the time of the purchase on September 2, 1971, obtained the former address, the present address and information from Mary's driver's license.
[2] Liabos v. Harman, 215 So.2d 487 (2 Fla. App. 1968).
[3] As we are here confronted with a summary judgment, the sixth element relating to damages must be considered as being admitted.
[4] Wilson v. O'Neal, 118 So.2d 101 (1 Fla.App. 1960); Azrikan v. O'Brien, 173 So.2d 711 (3 Fla.App. 1965); Adams v. Whitfield, 290 So.2d 49 (Fla. 1974); and Priest v. Groover, 289 So.2d 767 (2 Fla.App. 1974).
[5] Thompson v. Taylor, 183 So.2d 16 (1 Fla. App. 1966).
[6] Gallucci v. Milavic, 100 So.2d 375 (Fla. 1958).
[7] Great Atlantic & Pacific Tea Company v. Federal Detective Inc., 157 So.2d 148 (3 Fla.App. 1963).
[8] Article I, Section 21, Constitution of the State of Florida.
[9] Kilburn v. Davenport, 286 So.2d 241 (3 Fla.App. 1973); and O'Brien v. Food Fair Stores, North Dade, Inc., 155 So.2d 836 (3 Fla.App. 1963).
[10] Hart v. Duncan, 233 So.2d 133 (4 Fla.App. 1970), and Priest v. Groover, 289 So.2d 767 (3 Fla.App. 1974).
[1] The Rodgers' complaint does not mention the committal order and so does not make allegations attempting to avoid its effect. Those omissions would ordinarily seem acceptable under pleading rules that do not require a complainant to anticipate and negate defensive matter. Livingston v. American Title and Ins. Co., 133 So.2d 483 (Fla.App.1st, 1961). The Rodgers' pleading burden ordinarily would have been to allege want of probable cause, not to anticipate and impeach the evidence contrary to their position. But the rule of Gallucci makes those allegations essential. 100 So.2d at 377. See also our decision in Thompson, 183 So.2d at 19.
[2] "The magistrate's commitment of the accused is evidence that the person initiating the proceedings had probable cause." Note h to the Restatement rule is: "In determining, what, if any, weight should be given to the commitment by a magistrate, the court should take into account evidence that the commitment was due to the misconduct of the magistrate or was procured by false testimony offered by the prosecutor or given in his behalf." III Restatement of Torts, p. 414.
[3] Restatement of Torts § 667(1); Prosser, op. cit. at § 113, p. 865; Harper and James, op. cit. at § 4.5, pp. 315-16, 54 C.J.S. Malicious Prosecution § 37 at pp. 999 et seq.